# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEANDELL LEE DUPREE JONES,<br><br>                     Petitioner,<br><br>v.<br><br>C. CALLAHAN, Warden,<br><br>                     Respondent. | Case No.: 18-CV-646-AJB(WVG)<br><br>REPORT AND RECOMMENDATION RE: DENIAL OF HABEAS CORPUS PETITION |

Petitioner Seandell Jones, a state prisoner proceeding *pro se* with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenges his 2012 convictions in San Diego Superior Court case no. SCD234048 for first degree murder, robbery, shooting at an occupied vehicle, and unlawful taking of a vehicle. (Petition (or "Pet."), ECF No. 1 at 1.)[1] The Court has read and considered the Petition (ECF No. 1), the Answer and Memorandum of Points and Authorities in Support of the Answer (ECF No. 6), the Traverse (ECF No. 10), the lodgments and other documents filed in this case, and the legal arguments presented by both parties. For the reasons discussed below, the Court recommends the petition be DENIED.

---

[1] Page numbers for docketed materials cited in this Report and Recommendation refer to those generated by the Court's electronic case filing system.

# I.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). Jones was prosecuted together with his codefendants Rashon Abernathy and Shaquille Jordan.  The state appellate court recounted the facts as follows:

> In May 2011, Abernathy placed an advertisement on Craigslist claiming that he had a MacBook Pro computer to sell for $900.  After Abernathy communicated with a potential buyer, Erick Castillo, by exchanging text messages, Abernathy met with Castillo at a recreation center on May 5, 2011.  Abernathy brought along a friend for the transaction, but the other two defendants were not involved.  When Castillo took out $600 in cash to pay for the computer, Abernathy's friend grabbed the money and ran away with Abernathy.  Castillo chased them, and as Castillo came closer, Abernathy pulled out a gun and pointed it at Castillo, stating "I'm going to fucking kill you."  Castillo gave up the chase and called 911.

> A second robbery occurred on May 11, 2011, and involved Abernathy, Jones and Jordan.  Using the same Craigslist advertisement, Abernathy arranged to meet with 18-year-old Garrett Berki in front of a school around 9:15 p.m.  Berki brought his girlfriend, Alejandra Faudoa, along in the car for the transaction.  After waiting in front of the school for a few minutes, Berki got a call from Abernathy stating that the meeting place had changed to an apartment complex in the neighborhood.  Berki drove to the new location, where Abernathy and Jones were waiting outside. Abernathy insisted that Berki show him the money before handing over the computer.  During the discussion, Jones either showed Berki a gun or pointed it at him, stating that Abernathy would count the money.  Berki handed over the money, and Abernathy demanded that Berki and Faudoa give him their cell phones. Abernathy and Jones then ran away through the apartment complex with a total of $640 and the two cell phones.

> According to Abernathy, he got to the scene of the May 11 robbery after being picked up from home in a Honda driven by Jordan, in which Jones was a passenger.  Jordan parked near the apartment complex and dropped off

Abernathy and Jones so that they could commit the robbery. After the robbery Abernathy and Jones ran back to the Honda, and the three defendants decided to go to a nearby house where Jones's and Jordan's girlfriends lived. According to Abernathy, they stayed at the house for a few minutes but then were asked to leave, so they started driving toward a shopping mall.

Meanwhile, after being robbed, Berki and Faudoa sat in their car for a few minutes before deciding that Berki would drive to the police station to report the robbery. When Berki had driven one or two blocks from the scene of the robbery, he noticed Jordan, Jones and Abernathy in the Honda driving toward him. Berki and Faudoa decided to follow the Honda so that they could get the license plate number. Berki followed the Honda in and out of a parking lot and then through the streets and onto a freeway. Berki was driving close behind the Honda to try to see the license plate, and he was also driving in a manner that he hoped might attract the attention of the police, such as pulling directly in front of the Honda and putting on his brakes.

The Honda exited the freeway while Berki's car was in front of it, but Berki managed to drive over the freeway shoulder and down the off-ramp, following the Honda into a residential neighborhood. Both cars ended up on a dead-end street. Berki stopped his car at an angle before the end of the cul-de-sac while the Honda turned around at the end of the cul-de-sac and drove up next to Berki's car. Abernathy pointed a gun out of a backseat window of the Honda and fired one shot into Berki's car. Berki was shot in the left chest and was pronounced dead at the hospital a short time later.

The defendants drove a few blocks away, crashed the Honda and fled into the backyards of the residential neighborhood, where police located them by use of infrared helicopter cameras and K-9 units. After being arrested, Jones, Jordan and Abernathy were taken to the police station, where they made numerous statements connecting themselves to the crimes in a recorded jail cell conversation. Further, it was discovered that the Honda in which the defendants were riding had been stolen a few hours before the second robbery, either on the night of May 10 or the morning of May 11, 2011.

Based on the events of May 11, 2011, Abernathy, Jones and Jordan were each charged with first degree murder (§§ 187, subd. (a), 189); two counts of robbery (§ 211); shooting at an occupied motor vehicle (§ 246); and unlawfully taking and driving a vehicle (Veh. Code, § 10851, subd. (a)). Based on the May 5, 2011 robbery, Abernathy was charged with an additional count of robbery (§ 211). The information also included gang allegations for

each count as to each defendant (§ 186.22, subd. (b)(1)), and allegations as to each count (except the count for unlawfully taking or driving a vehicle) that a principal personally used a firearm in committing the crimes (§ 12022.53, subd. (b), (d), (e)(1)).

When Abernathy testified at trial, he admitted to committing both robberies and to shooting Berki, but he contended that the shooting was an accident caused by an inadvertent discharge of the gun. Abernathy also testified that he did not know that Jordan was driving a stolen vehicle until Jordan informed him of that fact when he got back into the Honda after the second robbery. Jordan and Jones did not testify at trial.

The jury found the defendants guilty on all counts but did not make a true finding on the gang allegations and found the firearm allegations to be true only as to Abernathy. The trial court sentenced Jones and Jordan to prison for 25 years to life and sentenced Abernathy to prison for 50 years to life.

(Lodgment No. 8, ECF No. 7-7 at 4-7.)

## II. PROCEDURAL BACKGROUND

On October 12, 2012, the San Diego County District Attorney's Office filed an amended information charging Jones with one count of murder, a violation of California Penal Code §§ 187(a) (count one); two counts of robbery, a violation of California Penal Code § 211 (counts two and three); one count of shooting at an occupied vehicle, a violation of California Penal Code § 246 (count four); and one count of unlawfully taking and driving a vehicle, a violation of California Penal Code § 10851(a) (count five). (Lodgment No. 1, ECF No. 7-2 at 3-11.)[2] As to counts one through three, the amended information also alleged that Jones was 16 years of age or older when the crimes were committed, within the meaning of California Penal Code § 707(d)(1); that he committed the crimes for the benefit of, at the direction of and in association with a criminal street gang, within the meaning of California Penal Code § 186.22(b)(1); and that Jones was a principal in the

---

[2] Abernathy and Jordan were charged with the same crimes as Jones, and Abernathy was charged in count six with a second, separate robbery. (Lodgment No. 1, ECF No. 7-2 at 9.)

offense and at least one principal personally used a firearm, within the meaning of California Penal Code § 12022.53(d) and e(1). (*Id.*) In addition, count four alleged the § 186.22(b)(1) criminal street gang and the § 12022.53(d) firearm allegations, and count five alleged the § 12022.53(d) firearm allegation. (*Id.*)

Following a jury trial, Jones was found guilty of counts one through five. The jury found the gang and firearm allegations to be not true. (Lodgment No. 1, ECF No. 7-5 at 42-46.)

Jones appealed his conviction. (Lodgment Nos. 3-5, ECF Nos. 7-22, 7-23 & 7-24.) The California Court of Appeal affirmed his conviction and directed that the abstract of judgments for each of the defendants be modified. *See People v. Jordan, et al.*, 185 Cal. App. 3d 174 (2015), *review granted and opinion superseded by People v. Jordan, et al.*, 351 P.3d 330 (2015). Jones thereafter filed a petition for review in the California Supreme Court, which was granted on a sentencing issue unrelated to the issues presented in this case. (Lodgment No. 6, ECF No. 7-25.) The California Supreme Court remanded the case to the state appellate court for consideration of the sentencing issue in light of new state authority. (*Id.*) Upon remand, the California Court of Appeal upheld the conviction and remanded the case to the trial court for consideration of a sentencing issue. (Lodgment No. 8, ECF No. 7-27.)[3] Jones then filed a petition for review in the California Supreme Court, which was denied without citation of authority. (Lodgment No. 10, ECF No. 7-29.)

Jones filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court on March 28, 2018. (ECF No. 1.) Respondent filed an Answer and Memorandum

---

[3] The remand was for the purpose of determining whether Jones, Jordan and Abernathy had been provided with a "sufficient opportunity to make a record of information relevant to [their] eventual youth offender parole hearing" pursuant to *People v. Franklin*, 63 Cal. 4th 261, 283-84 (2016) and California Penal Code §§ 3051, 3046(c) and 4801(c) which implemented the Supreme Court's ruling in *Miller v. Alabama*, 567 U.S. __, 132 S. Ct. 2455 (2012) (holding that the Eighth Amendment prohibits a mandatory life sentence without parole where a defendant is convicted of a homicide committed before the defendant's 18th birthday).

of Points and Authorities in Support of the Answer ("Answer") on June 7, 2018. (ECF No. 6.) Jones filed a Traverse on September 4, 2018. (ECF No. 10.)

### III.    STANDARD OF REVIEW

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

## IV.  DISCUSSION

Jones alleges in his Petition that his federal due process rights were violated when the trial judge refused to instruct the jury that, for purposes of the felony murder rule under California law, the target felony ends when the perpetrators reach a place of temporary safety. (Pet., ECF No. 1 at 13-19.) Respondent contends the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 6.)

Jones was prosecuted for murder under a felony murder theory—for the robbery as either a perpetrator or as an aider and abettor, and for the shooting at an occupied vehicle as an aider and abettor under the natural and probable consequences doctrine. (*See* Lodgment No. 1, ECF No. 7-2 at 115, 121-23, 125-29.) As to the felony murder, the prosecution argued that the murder of Berki occurred as part of one continuous transaction beginning with the robbery of Berki, while the defense argued the murder and robbery were not part of a continuous transaction because Jones and his accomplices had reached a place of temporary safety after the robbery. To that end, defense counsel asked that the instructions regarding felony murder include the "escape rule" which instructs the jury that

a crime continues only until the perpetrators have "actually reached a temporary place of safety." (*Id.* at 129.)  The instruction requested by the defense read as follows:

549 Felony Murder: One Continuous Transaction – Defined

In order for the People to prove that the defendant is guilty of murder under a theory of felony murder [and that the special circumstance of murder committed while engaged in the commission of _____ <insert felony> is true], the People must prove that the _____ <insert felony> [or attempted _____ <insert felony>] and the act causing the death were part of one continuous transaction.  The continuous transaction may occur over a period of time and in more than one location.

In deciding whether the act causing the death and the felony were part of *one continuous transaction*, you may consider the following factors:

1.  Whether the felony and the fatal act occurred at the same place;

2.  The time period, if any, between the felony and the fatal act;

3.   Whether the fatal act was committed for the purpose of aiding the commission of the felony or escape after the felony; [and before the defendant had reached a place of temporary safety.]

4.  Whether the fatal act occurred after the felony but while [one or more of] the perpetrator[s] continued to exercise control over the person who was the target of the felony;

5.  Whether the fatal act occurred while the perpetrator[s] (was/were) fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime;

6.  Whether the felony was the direct cause of the death;
AND
7.  Whether the death was a natural and probably consequence of the felony.

It is not required that the People prove any one of these factors or any particular combination of these factors.  The factors are given to assist you in deciding whether the fatal act and the felony were part of one continuous transaction.

(*Id.* at 53.)

The trial judge declined to give the instruction, relying on a California Supreme Court case, *People v. Cavitt*, 33 Cal. 4th 187 (2003), and concluding the escape rule did not apply to felony murder. The trial court instead gave a modified version of CALCRIM 549, which read as follows:

> A killing is committed during the commission of a robbery under the felony murder rule if the People have proved beyond a reasonable doubt that the robbery and the act causing death are part of one continuous transaction. The continuous transaction may occur over a period of time and in more than one location. There is no requirement that the act causing death occur while committing or while engaged in the robbery or that the killing be part of the robbery, so long as the People have proved the two acts are part of one continuous transaction.
>
> In deciding whether the killing and robbery were part of one *continuous transaction*, you may consider the following factors:
>
> 1. Whether the felony and the fatal act occurred at the same place;
>
> 2. The time period, if any, between the robbery and the fatal act;
>
> 3. Whether the fatal act was committed for the purpose of aiding the commission of the robbery or escape after the robbery;
>
> 4. Whether the fatal act occurred after the felony but while one or more of the perpetrators continued to exercise control over the person who was the target of the felony;
>
> 5. Whether the fatal act occurred while the perpetrators were fleeing from the scene of the robbery or otherwise trying to prevent the discovery or reporting of the crime;
>
> 6. Whether the robbery was the direct cause of the death;
>
> AND
>
> 7. Whether the death was the natural and probable consequence of the robbery.

It is not required that the People prove any one of these factors or any particular combination of these factors. This is not an exhaustive list. The factors are given to assist you in deciding whether the fatal act and the robbery were part of one continuous transaction.

(*Id.* at 122-23.)

After Jones was convicted but before he was sentenced, the California Supreme Court decided *People v. Wilkins*, 56 Cal. 4th 333 (2013), which clarified the court's holding in *Cavitt*. The *Wilkins* court held that the escape rule does apply to felony murder and that the failure to instruct the jury on the escape rule with regard to felony murder liability was federal constitutional error because it misinstructed the jury on an element of the offense. *Wilkins*, 56 Cal. 4th at 343-45, 349-50. Defense counsel filed a motion for a new trial, which the trial judge denied, finding that the failure to properly instruct the jury with the escape rule was harmless beyond a reasonable doubt. (Lodgment No. 2, ECF No. 7-20 at 39-47.)

Jones raised his instructional error claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 9, ECF No. 7-28.) The state supreme court denied the petition without citation of authority. (Lodgment No. 10, ECF No. 7-29.) Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 805-06. That court wrote:

> For the purposes of our analysis, we begin with the premise, as do the parties, that the trial court erred in failing to instruct the jury that the escape rule applies to the felony-murder counts. Specifically, after *Wilkins* it is clear that, with respect to felony murder, instead of instructing that the jury could find the robbery and the killing to be part of one continuous transaction based on several nonexclusive factors, including "[w]hether the fatal act occurred while the perpetrators were fleeing from the scene of the robbery or otherwise trying to prevent the discovery or reporting of the crime" (former CALCRIM No. 549, as given), the jury should have been instructed that the robbery and the killing could not be part of one continuous transaction if the defendants reached a place of temporary safety before the killing.

> The only disputed issue for us to resolve is whether the instructional error was prejudicial. *Wilkins* establishes that an error in failing to instruct

the jury on the escape rule for felony murder is a federal constitutional error because the error amounts to a misinstruction on an element of first degree murder. (*Wilkins*, *supra*, 56 Cal.4th at p. 350.) Applying the standard of prejudice applicable to federal constitutional error, we therefore examine whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. (*Ibid.*)

An instructional error is harmless beyond a reasonable doubt if " '[t]he factual question posed by the omitted instruction was necessarily resolved adversely to defendant under other, properly given instructions.' " (*People v. Pulido* (1997) 15 Cal.4th 713, 726.) Here, as we will explain, the jury was instructed on the escape rule under two other instructions and necessarily made findings on the escape rule adverse to the defendants in connection with those instructions. Based on those findings, we can safely conclude that the jury determined the defendants had not reached a place of temporary safety before the killing.

First, we explain why the instructional error was harmless as to Jones and Jordan. Those two defendants were prosecuted for shooting at an occupied motor vehicle in count 4 under the sole theory that they were guilty as aiders and abettors under the natural and probable consequences doctrine. As the jury was instructed, for the natural and probable consequences doctrine to apply, it must find that "[d]uring the commission of" the robbery, a coparticipant (i.e., Abernathy) committed the crime of shooting at an occupied motor vehicle, and that the shooting was a natural and probable consequence of the robbery.

The jury was further instructed to use the escape rule to determine whether the shooting occurred during the commission of the robbery for the purposes of the natural and probable consequences. Specifically, the jury was instructed with a modification of CALCRIM No. 3261, as follows: "For purposes of determining whether the crime of Shooting at an Occupied Vehicle was committed as a natural and probable consequence of robbery, the crime of robbery continues until the perpetrators have actually reached a temporary place of safety. [¶] The perpetrators have reached a temporary place of safety if: [¶] They have successfully escaped from the scene; [¶] They are no longer being chased; AND [¶] They have unchallenged possession of the property." Having been instructed with the modification of CALCRIM No. 3261, as quoted above, the jury found Jones and Jordan guilty of shooting at an occupied vehicle.

In light of the instruction on the escape rule in CALCRIM No. 3261, the jury could not have found Jones and Jordan guilty of shooting at an occupied vehicle unless it also found that the defendants had not reached a place of temporary safety before the shooting. Therefore, based on the jury's finding with respect to the natural and probable consequences doctrine for count 4, we can determine beyond a reasonable doubt what finding the jury would have made had it been properly instructed with the escape rule for felony murder. Specifically, based on the jury's verdict on the natural and probable consequences doctrine for count 4, if properly instructed on the escape rule for felony murder, it is clear that the jury would have found that Jones and Jordan did not reach a place of temporary safety before the shooting, so that the robbery and the murder were part of one continuous transaction as required for a guilty verdict on felony murder. The instructional error in failing to instruct on the escape rule for felony murder was therefore harmless beyond a reasonable doubt as to Jones and Jordan.

Second, we explain why the instructional error was harmless as to Abernathy. The jury was instructed with the escape rule in the context of the firearm allegations against Abernathy. Specifically, Abernathy was alleged to have personally and intentionally discharged a firearm causing death while committing the May 11 robbery, the murder of Berki and while shooting at an occupied vehicle. (§ 12022.53, subd. (d).) As the jury was instructed, to make a true finding on those firearm allegations as to each crime, it had to find, among other things, that Abernathy "personally discharged a firearm during the commission of that crime." (Italics added.)

To help the jury determine whether Abernathy personally discharged a firearm during the crimes, the trial court instructed with a modification of CALCRIM No. 3261 that for the purposes of "Personally Using Firearm: Causing Death . . . , the crime of robbery continues until the perpetrators have actually reached a temporary place of safety. [¶] The perpetrators have reached a temporary place of safety if: [¶] They have successfully escaped from the scene; [¶] They are no longer being chased; AND [¶] They have unchallenged possession of the property."

The jury made a true finding that Abernathy personally and intentionally discharged a firearm during the robbery of Berki and Faudoa, during the murder of Berki and while committing the crime of shooting at an occupied vehicle. We know that the only time Abernathy personally discharged a firearm during the events of May 11 was when he shot Berki in the cul-de-sac after the car chase. Therefore, in concluding that Abernathy

18-CV-646-AJB(WVG)

personally discharged a firearm during the robbery of Berki and Faudoa, the jury necessarily concluded that the robbery continued until the end of the car chase, when Abernathy shot Berki. [FN 5]

> [FN 5: Jordan and Jones argue that because the jury found the firearm allegations against them to be unproven, and the jury was instructed on the escape rule to determine whether a firearm was discharged during the commission of the crimes for the purposes of those firearm enhancements, the jury must have determined that the escape rule was not satisfied as to Jordan and Jones. The argument lacks merit. In contrast to the firearm allegations that the jury found to be true as to Abernathy for personally discharging a firearm under section 12022.53, subdivision (d), the only firearm enhancements alleged against Jordan and Jones were gang-related firearm enhancements, applicable to defendants who do not personally discharge a firearm, but who commit a gang-related crime together with the shooter. (§ 12022.53, subds. (d), (e)(1).) The jury was instructed that to make a true finding on the firearm allegations against Jordan and Jones as to each of the applicable counts, it was required to find that the defendants "committed those crimes for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further, or assist in any criminal conduct by gang members." The jury specifically found that the crimes were not gang related, requiring that they also find that the gang-related firearms allegations against Jordan and Jones were unproven. Therefore the jury's rejection of the firearm allegations against Jordan and Jones does not mean that the jury found that the escape rule was not satisfied as to them.]

In light of the instruction on the escape rule in CALCRIM No. 3261, the jury could not have found that the robbery continued until Abernathy shot Berki unless it also found that Abernathy did not reach a place of temporary safety before the shooting. We can therefore determine, beyond a reasonable doubt, based on the jury's true finding on the firearm allegations for the robbery counts, that if the jury had been properly instructed that the escape rule applied to felony murder, it would have concluded that Abernathy did not reach a place of temporary safety before the shooting. If properly instructed, the jury accordingly would have found that the robbery and the murder were part of one continuous transaction for the purposes of felony murder. The

instructional error in failing to instruct on the escape rule for felony murder was therefore harmless beyond a reasonable doubt as to Abernathy as well.

The defendants argue that the instructional error was nevertheless prejudicial – even in light of the finding on the escape rule in the context of the natural and probable consequences doctrine for count 4 against Jones and Jordan and the firearm allegations against Abernathy – because the jury must have been confused by the different standards in former CALCRIM No. 549 and CALCRIM No. 3261 for determining whether the robbery continued until the shooting.  [FN 6].

[FN 6: Defendants cite *Wilkin*'s statement, made in a slightly different context, that it could be "confusing or misleading" if a trial court instructed with both CALCRIM No. 3261 and former CALCRIM No. 549.  (*Wilkins*, *supra*, 56 Cal.4th at p. 348, fn. 4.)  Defendants' citation to *Wilkins* does not advance their argument.  *Wilkins* posited that it would be confusing and misleading for trial courts to fashion an instruction on the escape rule for felony murder by giving both CALCRIM No. 3261 and former CALCRIM No. 549 together.  Here, of course, both instructions were not given in an attempt to instruct on the escape rule for felony murder.  Instead, the trial court gave both instructions because it concluded that the escape rule instruction in CALCRIM No. 3261 was warranted for the count of shooting at an occupied vehicle and the firearm allegations, and former CALCRIM No. 549, in contrast, was needed to explain the one continuous transaction doctrine for felony murder, and the distinction was made clear to the jury.]

According to defendants, we cannot be certain that the jury properly applied the escape rule as described in CALCRIM No. 3261 because its analysis may have been tainted by the different standards set forth in former CALCRIM No. 549 for deciding whether the robbery and the shooting were one continuous transaction for the purpose of felony murder.

Based on our review of the record, we perceive no indication of any confusion caused by the fact that the jury was instructed with former CALCRIM No. 549 as well as CALCRIM No. 3261.  We therefore perceive no problem with relying on the jury's findings as to the duration of the robbery in the context of the natural and probable consequences doctrine for count 4 and the firearm allegations in conducting our harmless error analysis.  Indeed,

during closing arguments the difference in the standards for determining the duration of the robbery as set forth in former CALCRIM No. 549 and CALCRIM No. 3261 was extensively explained to the jury, and that explanation would have dispelled any confusion that could have been caused by the conflicting standards in the two instructions. [FN 7]

[FN 7: Specifically, during closing argument the prosecutor explained that the time frame involved in the question of whether the defendants had reached a place of temporary safety before the shooting is "different than the felony[-]murder one continuous transaction. This is what's known as the escape rule. It's going to sound similar because, again, you can use this as a factor to determine if it's one continuous transaction, but it is not the same thing." The prosecutor explained, "You can have the defendants reach a place of temporary safety and still have felony murder and still have one continuous transaction. They both can coexist." In his rebuttal argument, the prosecutor again returned to the contrast between the two instructions. "The jury instructions define robbery for you and how long this takes. For felony murder, it takes as long as the one continuous transaction doctrine. For natural and probable consequences and for gun usage, it takes as long as the escape rule says. The escape rule is not as long as the one continuous transaction. The one continuous transaction extends beyond the escape rule." Counsel for Jones also spent a considerable portion of his closing argument describing the two different instructions for determining the duration of the robbery. Specifically, he described at length both the question of whether the defendants had reached a place of temporary safety for the purpose of the natural and probable consequences doctrine as well as the multi-factored test for determining in the context of felony murder whether the robbery and the shooting were part of one continuous transaction.]

We accordingly conclude that the trial court's error in failing to instruct on the escape rule for felony murder was harmless beyond a reasonable doubt as to each of the defendants.

(Lodgment No. 8, ECF No. 7-27 at 12-18.)

When an error of federal constitutional magnitude occurs at trial, a reviewing court on direct appeal must determine whether the error was harmless beyond a reasonable doubt.

*Chapman v. California*, 386 U.S. 18, 24 (1967). The state court properly applied this standard in its analysis. (Lodgment No. 8, ECF No. 7-27 at 12-13.) When a petitioner challenges a state court's determination under *Chapman* on federal habeas corpus review, a federal court must review the state court's harmlessness determination under AEDPA's standard:

> When a *Chapman* decision is reviewed under AEDPA, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *Fry [v. Pliler]*, *supra*, [551 U.S.] at 119 [citation omitted] (emphasis in original). And a state-court decision is not unreasonable if " 'fairminded jurists could disagree' on [its] correctness." *[Harrington v.] Richter*, *supra*, [562 U.S.] at 101 [citations omitted]. [A petitioner] therefore must show that the state court's decision to reject his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." [*Richter*, 562 U.S., at 103 [citation omitted].

*Davis v. Ayala*, __ U.S. __, 135 S. Ct. 2187, 2199 (2015).

Liability under California's felony murder rule requires the prosecution to establish both a causal connection and a temporal relationship between the underlying felony and the homicide. *People v. Cavitt*, 33 Cal. 4th 187, 196 (2004). As to the causal connection requirement, "there must be a logical nexus – i.e., more than mere coincidence of time and place – between the felony and the act resulting in death . . . ." *Id.* The temporal relationship between the felony and the homicide is sufficient if the felony and the homicide "are part of one continuous transaction." *Id.* "Felony-murder liability continues throughout the flight of a perpetrator from the scene of the robbery until the perpetrator reaches a place of temporary safety," and the escape rule "establishes the outer limits of the continuous transaction theory." *Wilkins*, 56 Cal. 4th at 345.

The trial court correctly instructed the jury on the causal connection requirement for felony murder by stating that in order to convict Jones of the crime, they were required to conclude that "[t]here was a logical connection between the cause of death and the robbery," and that "[t]he connection between the cause of death and the robbery must involve more than mere coincidence of time and place." (Lodgment No. 1, ECF No. 7-2

at 121.) The trial court also correctly instructed the jury regarding the temporal connection requirement by noting that the prosecution was required to prove beyond a reasonable doubt that "the robbery and the act causing death [were] part of one continuous transaction," and gave the jury several factors to consider when deciding whether the robbery and killing were one continuous transaction. These factors included "[w]hether the fatal act was committed for the purpose of aiding and abetting the commission of the robbery or escape after the robbery," and "[w]hether the fatal act occurred while the perpetrators were fleeing from the scene of the robbery or otherwise trying to prevent the discovery or reporting of the crime." (*Id.* at 122.) As the appellate court concluded, however, the felony murder instructions incorrectly failed to include the escape rule.

Although the jury was not instructed on the escape rule for the felony murder counts, the jury *was* instructed on the escape rule for the robbery and shooting at an occupied vehicle counts. The instructions for those counts defined the crimes of robbery and shooting at an occupied vehicle. The instructions then told the jury that Jones's liability for shooting at an occupied vehicle was via a theory that Jones either perpetrated or aided and abetted the robbery, the natural and probable consequences of which was that a coparticipant committed the crime of shooting at an occupied vehicle. The relevant instructions read as follows:

402. Shooting at an Occupied Vehicle
Natural and Probable Consequences Doctrine
Target and Non-Target Offenses Charged
Aider and Abettor

The People are prosecuting defendants Jones and Jordan of Shooting at an Occupied Vehicle as aiders and abettors under the natural and probable consequences doctrine. Under certain circumstances, a person who is guilty of one crime may also be guilty of another crime that was the natural and probable consequences of the crime aided and abetted.

In order to find defendant Jones or Jordan guilty of this crime you must first decide whether each defendant is guilty of Robbery. If you find the defendant

is guilty of Robbery, you must then decide whether he is guilty of Shooting at an Occupied Motor Vehicle.

To prove that defendant Jones or Jordan is guilty of Shooting at an Occupied Motor Vehicle, the People must prove:

1. The defendant is guilty of Robbery (as either a perpetrator or aider and abettor);

2. During the commission of Robbery, a coparticipant in that Robbery committed the crime of Shooting at an Occupied Motor Vehicle;

AND

3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of Shooting at an Occupied Vehicle was a natural and probable consequence of the commission of the Robbery.

. . . .

3261: Robbery: escape rule.
Natural and Probable Consequence
Count 4

For purposes of determining whether the crime of Shooting at an Occupied Vehicle was committed as a natural and probable consequence of robbery, the crime of robbery continues until the perpetrators have actually reached a temporary place of safety.

The perpetrators have reached a temporary place of safety if:

- They have successfully escaped from the scene;
- They are no longer being chased;
  AND
- They have unchallenged possession of the property.

(Lodgment No. 1, ECF No. 7-2 at 127-29.)

    With the totality of these instructions in mind, the jury then convicted Jones of robbery and shooting at an occupied vehicle. Importantly, in order to arrive at those conclusions under these instructions, the jury had to first find that Jones had committed a

robbery and that the robbery was still in progress when the crime of shooting at an occupied vehicle occurred.  And, in order for the jury to have concluded that the robbery was still in progress when the shooting occurred under these instructions, they necessarily had to have found that Jones had not reached a place of temporary safety at any point prior to the shooting.  Had the jury found that Jones *had* reached a place of temporary safety before the shooting, they could *not* have found him guilty of shooting at an occupied vehicle and, by necessary deduction, the felony murder.  They could not have so found because the shooting would have been a separate and distinct crime that was committed only by Abernathy—not part of the continuing robbery.  Given the verdicts on the robbery and shooting at an occupied vehicle counts, therefore, the state court's conclusion that the instructional error was harmless beyond a reasonable doubt was objectively reasonable. *Davis*, 135 S. Ct. at 2199; *Yarborough*, 540 U.S. at 4.

Moreover, the evidence presented at trial supports a conclusion that the jury would not have found Jones and his confederates had reached a place of temporary safety before Abernathy shot Berki even if the felony murder instructions had included the escape rule. Ali Faudoa, Berki's girlfriend, testified that after the robbery they sat in the car for "[*no*] *more than a couple of minutes*" before Berki began driving, intending to drive to a police station to report the crime.  (Lodgment No. 2, ECF No. 7-11 at 47 (emphasis added).) Faudoa testified that they encountered Jones and his coparticipants very shortly thereafter:

[THE PROSECUTOR]:  What happened after he started driving away?

[FAUDOA]:  Um, like the next thing I know is my head's down, and Garrett [Berki] – he is, like, "That's them.  That's them."  And so I look up. And the next thing I know, we're following a car.

Q:  What kind of car are you following?

A:  It was like – looked like it was black, but it was just really a dark-colored car.  And it looked like a Jetta or something, old Jetta.

Q:  Like a sedan as opposed to a sports car?

A:  Yeah.

Q:  Were you in the same neighborhood where this robbery took place?

A:  Yes, in the same neighborhood, yeah.

Q:  How far had you traveled from, in distance, would you say, from where you were robbed from where Mr. Berki said, "That's them," and you looked up and saw the car?

A:  Maybe like a quarter of a mile.

Q:  How many blocks would you say you traveled?

A:  One or two.

Q:  The area you were in – did it appear to be the same apartment complex?

A:  Yes.

Q:  What indicated to you it was the same apartment complex?

A:  Um, 'cause when we had started to follow them, we pulled into the apartment complex, like, parking lot for the tenants there.

(*Id.* at 47-48.)

After both cars exited the parking lot, Berki followed the car Jones was riding in onto the freeway and ultimately to the cul-de-sac where the shooting took place.  (*Id.* at 48-63.)

Abernathy testified that after the robbery, he and Jones ran away through a nearby apartment complex to a car Jordan was driving.  (Lodgment No. 2, ECF No. 7-15 at 209-10.)  They drove to a house where a friend of Jordan's, Carlene, lived.  (*Id.* at 217.)  Carlene was not home, but Carlene's friend Sylvianita was.  Sylvianita did not live at the house and was a guest.  When Jones, Jordan and Abernathy entered the house, Sylvianita insisted they had to leave because she did not know when Carlene and her mother were coming home.

18-CV-646-AJB(WVG)

(*Id.* at 217-20.)  While Sylvianita and Jordan were talking, Abernathy tried to hide the gun at the house but was unsuccessful because he did not feel comfortable leaving it there.  (*Id.* at 218-19.)  Abernathy testified that he, Jones, and Jordan were at the residence only a short time before they got back into the car and were later followed by Berki and Faudoa to the scene of the shooting.  (*Id.* at 220-22.)  Abernathy testified that when they entered the apartment, Sylvianita met them near the entry-way, "wasn't happy [they] showed up," and repeatedly told them to leave the residence: "I kept hearing [Sylvianita] say [to Jordan], 'oh, you guys can't be here.  You need to leave.  You guys got to leave.'  I kept hearing that."  (*Id.* at 221.)  Unable to convince Sylvianita to allow them to stay, they left shortly after arriving at the residence and began to drive again.  (*Id.* at 221-22.)

Jones and his accomplices were rebuffed and told to leave shortly after arriving at Carlene's house.  This, coupled Faudoa's testimony that only a couple of minutes had elapsed between the robbery and when she and Berki saw the car carrying all three defendants, corroborates Abernathy's version of the timeline between the robbery, Jones's travel to Carlene's house, and the shooting was very short.  Thus, the evidence supports the jury's necessary conclusion that Jones was in continuous flight from the scene of the robbery and had not "reached a temporary place of safety" or successfully escaped from the scene of the crime.  (*See* Lodgment No. 2, ECF No. 7-2 at 129 [Robbery Escape Rule, Natural and Probable Consequences Instruction, CALCRIM No. 3261].)  Further, Berki's pursuit of Jones and the others began within minutes of the robbery and continued uninterrupted until the shooting took place, establishing that the perpetrators were still being chased and did not have unchallenged possession of the property.  (*Id.*)

Jones has attached a copy of an interview report by a defense investigator in which the investigator recounts an interview with Juror No. 5.  (Pet., ECF No. 1 at 18.)  Juror No. 5 claims she had "a reasonable doubt whether this event was a continuous transaction," and that "because Allie (Berki's girlfriend and a victim) testified she felt the incident was over after the robbery concluded," she did not think the shooting was part of a continuous transaction.  (*Id.*)  Juror No. 5 also claimed the "continuous transaction" instruction was

unclear. (*Id.*) This Court cannot consider the interview report. Federal Rule of Evidence 606(b) prohibits the use of a juror's testimony regarding the jury's mental processes, statements made or incidents which occurred during deliberations, or the effect of any such statements or incidents on an individual juror's mental process. Clearly established Supreme Court law states that, except for "extraneous influences," juror testimony that impeaches a verdict is "flatly prohibited." *Tanner v. United States*, 483 U.S. 107, 117 (1987); *see also Warger v. Shauers*, __ U.S. __, 135 S. Ct. 521, 529-30 (2014). Excluded evidence, evidence extrinsic to the trial, and other outside influences such as threats and bribes have been found to be "extraneous influences." *Mattox v. United States*, 146 U.S. 140, 148-53 (1892); *United States v. Henley*, 238 F.3d 1111, 1115-18 (9th Cir. 2001). By contrast, recounting personal experiences, discussions of the defendant's failure to testify, jurors' ability to see and comprehend evidence, allegations that jurors were under the influence, incompetent or did not follow jury instructions are all are considered internal processes and are not to be considered by a court faced with a motion for a new trial due to juror misconduct. *Tanner*, 483 U.S. at 120-21; Fed. R. Evid. 606(b).

Even if the Court could consider Juror No. 5's statements, those statements only indicate Juror No. 5 felt conflicted about convicting Jones of felony murder because "it did not seem fair" and "there was no other option using the felony murder theory." (Pet., ECF No. 1 at 18.) Although Juror No. 5 claims she "had a reasonable doubt whether this event was a continuous transaction," and she felt "the instruction about the definition of a continuous transaction was unclear so it was up to each person's personal interpretation" as to what it meant, she and three other jurors nonetheless "ultimately felt [convicting Jones and Jordan of felony murder] was the right thing to do." (*Id.*) The report does not state that Juror No. 5 would not have convicted Jones if she had been instructed with the escape rule with regard to the felony murder count.

For the foregoing reasons, Jones has not established that the state court's conclusion that the instructional error was harmless beyond a reasonable doubt "was so lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility of fairminded disagreement." *Davis*, 135 S. Ct. 2199. Moreover, the state court's denial of Jones's claim was not based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Jones is therefore not entitled to federal habeas corpus relief.

## V.    CONCLUSION

This Court submits this Report and Recommendation to United States District Judge Anthony J. Battaglia under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

IT IS HEREBY RECOMMENDED that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered DENYING the Petition for Writ of Habeas Corpus.

IT IS ORDERED that **no later than October 15, 2018** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and served on all parties **no later than November 2, 2018**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

IT IS SO ORDERED.

DATED:  September 17, 2018

Hon. William V. Gallo
United States Magistrate Judge

18-CV-646-AJB(WVG)